MALRITE T. V. OF NEW YORK, et al., Petitioners,

v.

FEDERAL COMMUNICATIONS COMMISSION, United States of America, Respondents.

Nos. 865, 1284 to 1286, Dockets 80–4120, 80–4160, 80–4202 and 80–4204.

United States Court of Appeals, Second Circuit.

Argued March 19, 1981.

Decided June 16, 1981.

Michael S. Horne, Washington, D. C. (J. Geoffrey Bentley, Alex Kozinski, Covington & Burling, Samuel Miller, Miller & Fields, Arthur B. Goodkind, Koteen & Burt, Erwin G. Krasnow, James J. Popham, Jerome C. Shestack, R. Clark Wadlow, Schnader, Harrison, Segal & Lewis, Martin E. Firestone, Stein, Halpert & Miller, Steven A. Lerman and McKenna, Wilkinson & Kittner, Washington, D. C., on the brief), for petitioners Malrite T. V. of New York, Inc., and McGraw-Hill Broadcasting Co., Inc., and intervenors Hubbard Broadcasting, Inc., et al., Taft Broadcasting, Inc., et al., Bahia de San Francisco Television Co., et al., National Ass'n of Broadcasters, Cedar Rapids Television Co., et al., Springfield Television Corp., and National Broadcasting Co., Inc.

J. Laurent Scharff, Mark J. Tauber, Jack N. Goodman, Joseph M. Sellers, Pierson, Ball & Dowd, Lee M. Mitchell, Alan L. Morrison, Tom W. Davidson, Sidley & Austin, Thomas J. Dougherty, Preston R. Padden, Robert A. Beizer, Steven M. Harris, and Schnader, Harrison, Segal & Lewis, Washington, D. C., submitted a brief for petitioner Association of Independent Television Stations, Inc., and intervenors Field Communications Corp., Gaylord Broadcasting Co., Metromedia, Inc., and Tribune Co.

James F. Fitzpatrick, David H. Lloyd, Robert Alan Garrett, Arnold & Porter, Philip R. Hochberg, Vorys, Sater, Seymour & Pease, Thomas C. Williams, and Stanford, Williams & Briggs, Washington, D. C., and Alexander H. Hadden, New York City, submitted a brief for petitioners Commissioner of Baseball, National Basketball Ass'n, National Hockey League, and National Football League.

James A. McKenna, Jr., Vernon L. Wilkinson, Robert W. Coll, Steven A. Lerman, Dennis P. Corbett, and McKenna, Wilkinson & Kittner, Washington, D. C., submitted a brief for intervenor American Broadcasting Companies, Inc.

J. Roger Wollenberg, Joel Rosenbloom, Jonathan Becker, and Wilmer & Pickering, Washington, D. C., George Vradenburg, III, and Harry R. Olsson, Jr., New York City, submitted a brief for intervenor CBS Inc.

Dennis F. Begley, Matthew H. McCormick, and Midlen & Reddy, Washington, D. C., submitted a brief for intervenor The Jet Broadcasting Co., Inc.

Barbara Scott, New York City, submitted a brief for intervenor Motion Picture Ass'n of America.

Victor E. Ferrall, Jr., Brian C. Elmer, John I. Stewart, Jr., and Crowell & Moring, Washington, D. C., submitted a brief for intervenor Omega Communications, Inc.

David J. Saylor, Deputy Gen. Counsel, Washington, D. C. (Robert R. Bruce, Gen. Counsel, Daniel M. Armstrong, Assoc. Gen. Counsel, Jane E. Mago, Jeffrey B. Kindler, FCC, Sanford M. Litvack, Asst. Atty. Gen., Barry M. Grossman, Bruce E. Fein, Dept. of Justice, Washington, D. C., on the brief), for respondents Federal Communications Commission and the United States of America.

Brenda L. Fox, Washington, D. C. (James H. Ewalt and Stephen R. Effros, Washington, D. C., on the brief), for intervenors National Cable Television Ass'n, Inc. and Community Antenna Television Ass'n, Inc.

John P. Cole, Jr., and Cole, Raywid & Braverman, Washington, D. C., submitted a brief for intervenors Allen's TV Cable Service, Inc., et al. and United Video, Inc.

Before NEWMAN and KEARSE, Circuit Judges, and METZNER,* District Judge.

NEWMAN, Circuit Judge:

In a major reversal of its regulatory policy, the Federal Communications Commis-

---

\* The Honorable Charles M. Metzner of the United States District Court for the Southern District of New York, sitting by designation.

sion ("FCC" or "Commission") has decided to deregulate cable television by rescinding rules relating to syndicated program exclusivity and distant signal carriage. Television broadcasting and programming interests have petitioned to set aside the FCC's order and to reimpose the regulations, which have been in force since 1972. On November 19, 1980 we stayed the order pending the disposition of the appeal. We now vacate the stay and deny the petition, thereby permitting the exclusivity and distant signal rules to be repealed.

I.

The television broadcasting industry, transmitting video signals free to viewers, is dominated by the three national networks, which contract with local station affiliates to carry network programming, most of which the networks purchase from independent producers. In addition, there are unaffiliated, independent stations which obtain most of their programming in the syndication market.[1] The cable television industry consists of various local systems, which transmit broadcast video signals from a central station to individual homes by closed circuit, coaxial cable. Cable subscribers pay a monthly fee to receive a basic set of channels plus an optional fee for special channels (pay cable).

Each of the 1,000 broadcasting stations, affiliate or independent, operates along an electromagnetic frequency established by the FCC on either very high frequency (VHF) or ultra high frequency (UHF) channels. The VHF range produces a higher quality viewing signal than UHF for most viewers. Though the FCC had avidly supported the expansion of UHF channels as a means of providing increased program diversity and expression of local interests,

UHF stations have been plagued with financial difficulties due to small audiences and low revenues, stemming in part from their inferior reception, and comprise the least profitable sector of the television industry. See R. Noll, M. Peck & J. McGowan, *Economic Aspects of Television Regulation* 79–129 (1973) [hereafter "R. Noll, et al."]; *Revised TV Broadcasting Financial Data—1978*, FCC Memo No. 30037 (July 17, 1980). The networks and their affiliates, which operate primarily in the VHF range, account for the largest audience shares and the vast majority of industry revenues and profits. See R. Noll, et al., supra at 3–5, 16–18; *Revised TV Broadcasting Financial Data—1978, supra.*

Cable television mitigates some of the disadvantages faced by UHF stations by making possible improved reception; to a cable subscriber, the reception quality of a UHF signal is indistinguishable from a VHF signal. But cable provides an additional service by increasing the number of stations available to a viewer through the importation of signals from distant geographic areas using microwave relays or orbiting communications satellites. Cable increases viewers' program choices, offering greater content and time diversity, and consequently it diverts some portion of the viewing audience away from local broadcast stations to more distant ones.

After an initial period in which the FCC declined to exercise regulatory authority over cable television on the grounds that it did not have jurisdiction under the Communications Act, see *Frontier Broadcasting Co. v. Collier*, 24 F.C.C. 251 (1958), *reconsideration denied in Report and Order in Docket No. 12443*, 26 F.C.C. 403, 428 (1959), the FCC began to regulate the cable industry directly in 1966.[2] *See Second Report and*

---

1. Syndicated programming, supplied by independent producers, consists of either programs previously broadcast on network stations or newly produced programs. Unlike network programming, simultaneous broadcasting of syndicated programs is infrequent because the independent stations do not all purchase the same programs. *See* Besen, Manning & Mitchell, *Copyright Liability for Cable Television:*

*Compulsory Licensing and the Coase Theorem,* 21 J.L. & Econ. 67, 77 (1978).

2. The Commission began regulating the cable industry indirectly as early as 1962, when it denied a request for a permit by a common carrier to install microwave relays to carry signals for a cable television system. *Carter Mountain Transmission Corp.,* 32 F.C.C. 459 (1962), *aff'd,* 321 F.2d 359 (D.C.Cir.), *cert. de-*

*Order in Docket Nos. 14895, 15233 and 15971,* 2 F.C.C.2d 725 (1966). The Supreme Court upheld the FCC's jurisdiction over cable in *United States v. Southwestern Cable Co.,* 392 U.S. 157, 178, 88 S.Ct. 1994, 2005, 20 L.Ed.2d 1001 (1968), insofar as the particular regulations were "reasonably ancillary" to the Commission's performance of its statutory duties. These 1966 regulations initiated close to a decade of regulation that can fairly be described as hostile to the growth of the cable industry, as the FCC sought to protect, in the name of localism and program diversity, the position of existing broadcasters and, particularly, the struggling UHF stations. *See* Besen & Crandall, *The Deregulation of Cable Television,* 44 Law & Contemp.Prob. 77 (1981); Chazen & Ross, *Federal Regulation of Cable Television: The Visible Hand,* 83 Harv.L. Rev. 1820 (1970). These rules severely restricted the expansion of cable television services by permitting cable operators in the top 100 markets to import distant signals only after showing in an evidentiary hearing that to do so would be in the public interest and not harmful to UHF broadcast services.[3] While the cable industry continued to grow in the 1960's in spite of these restrictions and other costly operating requirements, such as mandatory program origination, access, channel capacity, and other equipment regulations, it entered the 1970's as a small industry, relegated primarily to rural areas and small communities due in large part to the FCC's policies. Besen & Crandall, *supra* at 79, 93.

In late 1971, the Commission began to consider relaxation of the cable television regulations. *See Commission Proposals for Regulation of Cable Television,* 31 F.C.C.2d 115 (1971) ("Letter of Intent" to Congress). Shortly thereafter, the 1972 regulations emerged from an industry-wide Consensus Agreement negotiated by the White House and the affected industry interests—broadcasters, cable operators, and program producers (copyright owners). *Cable Television Report and Order,* 36 F.C.C.2d 143 (1972). Though the 1972 rules eased the 1966 restrictions and permitted limited cable expansion, broadcasting interests were still strongly protected. The Report and Order challenged on this appeal, *Report and Order in Docket Nos. 20988 and 21284,* 79 F.C.C.2d 663 (1980) [hereafter "Report and Order"], abolishes the core of the 1972 regulatory structure by repealing the two main methods of broadcaster protection, the distant signal carriage and syndicated program exclusivity restrictions on cable retransmissions.

The distant signal rules, 47 C.F.R. §§ 76.59(b)–(e), 76.61(b)–(f), and 76.63 (1980), limit the number of signals from distant stations that a cable system can transmit to its subscribers, the limit varying according to market size and the number of available over-the-air signals within the market. While cable systems are required to carry all local stations (defined as within 35 miles of the cable system's community), the number of distant signals that they can carry is limited as follows: in the top 50 markets, cable systems can make available a total of 3 network stations and 3 independents; in the second 50 markets, 3 networks and 2 independents; in the smaller markets, 3 networks and 1 independent; 2 "bonus" independent signals can be carried in major markets where local signals fill the allotted

---

nied, 375 U.S. 951, 84 S.Ct. 442, 11 L.Ed.2d 312 (1963). The Commission held that granting the permit, though improving the cable system's service to its subscribers, was not in the public interest because it would adversely affect the economic operation of a local broadcast station.

3. There are about 200 television markets in the United States. Eighty-six per cent of the approximately 74 million television households are located in the top 100 markets; 33 per cent are in the top 10 markets. *Notice of Proposed Rule Making in Docket Nos. 20988 and 21284,* 71 F.C.C.2d 1004, 1011 (1979). About one-third of all television households have access to cable service, and about 19 per cent of all television households subscribe. *Id.* at 1013–14. The households for which a cable connection is available are located primarily outside of the major metropolitan markets. *Report in Docket No. 21284, Inquiry into the Economic Relationship Between Television Broadcasting and Cable Television,* 71 F.C.C.2d 632, 664–65 (1979) [hereafter "Economic Inquiry Report"].

cable complement. By limiting the number of distant signals, the FCC sought to lessen potential adverse impact on the audience shares of local stations, a policy which has the additional effect of lessening the attractiveness of cable to potential subscribers.[4]

The syndicated program exclusivity rules, 47 C.F.R. §§ 76.151–76.161 (1980), authorize a local television station, which has purchased exclusive exhibition rights to a program, to demand that a local cable system delete that program from distant signals, whether or not the television station was simultaneously showing, or ever planning to show, the program. Copyright holders, in addition to broadcasters, are also protected by the rules and can require deletion of their programs from cable systems. The extent and duration of this protection varies according to market size, program type, and time of showing, with the greatest protection afforded to stations located in the largest markets.[5] Cable operators are allowed to substitute other distant signals when they have to delete a program under these rules.

These 1972 rules were fashioned in the context of a continuing policy debate as to whether cable operators should face copyright liability for the programs they retransmitted to subscribers. Prior to Congress' revision of the copyright laws in 1976, the Supreme Court had consistently held that cable systems were not liable under the copyright laws for their use of copyrighted broadcast programs without the owner's consent. *Teleprompter Corp. v. Columbia Broadcasting System, Inc.*, 415 U.S. 394, 94 S.Ct. 1129, 39 L.Ed.2d 415 (1974); *Fortnightly Corp. v. United Artists Television, Inc.*, 392 U.S. 390, 88 S.Ct. 2084, 20 L.Ed.2d 1176 (1968). As a result of these rulings, while the broadcasting industry spent billions of dollars to create and purchase pro-

4. One of the major reasons for subscribing to cable is the access to more programming. Consequently the penetration rate, that is, the per cent of households subscribing of those with access to the system, varies with the number of signals imported. Several economic studies have estimated the value of additional signals to viewers, and, in general, conclude that carriage of four distant independent signals increases cable penetration rates by an average of at least 9 percentage points. *See Economic Inquiry Report, supra,* 71 F.C.C.2d at 670. For specific calculations *see, e. g.,* Charles River Associates, Inc., *An Analysis of the Demand for Cable Television* 47 (1973); R. Noll, *et al., supra* at 277–78.

5. For example, in the top 50 markets, at the request of a local station, cable operators must delete all syndicated programs under exclusive exhibition contract to the requesting station, regardless of when the program is scheduled for showing on the local station, and program copyright owners can request deletion for one year after the first syndicated sale of the program, even if no local station has the rights to exhibit it. In the second 50 markets, distant syndicated programs need not be deleted if broadcast in prime time unless the requesting local station is also planning to air the program in prime time, and exclusivity rights expire at specified time periods or on the occurrence of specified events, depending on the nature of the program, *e. g.,* first-run syndicated series and feature films are protected for two years while reruns of network series are protected for only one year. Only systems in the top 100 markets are subject to these rules.

Though much less comprehensive in coverage, exclusivity rules exist for network programming. Duplication of network programming is prohibited with respect to simultaneous showings. 47 C.F.R. §§ 76.92–76.99 (1980). The duration of network program protection is more limited than that for syndicated programs in part due to the different methods of distribution. Unlike network programs, which are shown at the same time on virtually all affiliates as they come over the air, with exceptions for stations in different time zones that involve program retaping, syndicated programs are shown at separately scheduled, diverse times by each purchasing independent station. Moreover, cable systems may not carry more than three network signals, which reduces the possibility of duplication of local affiliate programming, whereas they can carry several independent signals, which increases the likelihood of a syndicated program being duplicated. The network nonduplication rules, as well as rules requiring the blacking out of certain live sports programs, 47 C.F.R. § 76.67 (1980), are not altered by the Report and Order challenged on appeal, though petitioners Commissioner of Baseball, National Football League, National Basketball Association, and National Hockey League, and intervenors American Broadcasting Companies, Inc., and Jet Broadcasting Company, Inc., contend that repeal of the distant signal and syndicated exclusivity rules will decrease the effectiveness of the network and sports programming regulations.

gramming,[6] cable operators could retransmit those programs at their operating cost without making any payments to program suppliers. Losing in the courts, broadcasters sought FCC protection from what they alleged was a situation of "unfair competition" by cable systems. The FCC rules restricting cable operators' ability to carry distant signals and syndicated programs served, in effect, as proxies for the copyright liability the courts had refused to impose, by restricting cable systems in their use of copyrighted works. *See* H.R.Rep.No. 1476, 94th Cong., 2d Sess. 176–77, *reprinted in* [1976] U.S.Code Cong. & Ad.News 5659, 5792–93; Comment, *Regulatory Versus Property Rights Solutions for the Cable Television Problem*, 69 Calif.L.Rev. 527, 536–44 (1981). Indeed, the revision of the cable television rules in 1972 pursuant to the industry-wide compromise was undertaken with a view toward facilitating enactment of legislation imposing copyright liability on cable operators. *See Commission Proposals for Regulation of Cable Television, supra*, 31 F.C.C.2d at 115–16; *Geller v. FCC*, 610 F.2d 973, 974–75 (D.C.Cir.1979) (*per curiam*).

The situation changed, however, in 1976, when Congress adopted a system of partial copyright liability for cable television with a compulsory licensing scheme. 17 U.S.C. § 111 (1976). Under the new Copyright Act, cable operators are expressly permitted to retransmit programs without any need to obtain the consent of, or negotiate license fees directly with, copyright owners, but in return they must pay the owners a prescribed royalty fee, based on the number of distant signals the system carries and its gross revenues. *Ibid. See generally Nimmer on Copyright* § 8.18[E] (1980). After Congress had resolved the copyright issue by a system of compulsory licensing, the FCC commenced an inquiry into the need

for maintaining its copyright surrogates, the distant signal and syndicated exclusivity rules. *Notice of Inquiry in Docket No. 20988*, 61 F.C.C.2d 746 (1976) (announcing review of desirability of syndicated exclusivity rules); *Notice of Inquiry in Docket No. 21284*, 65 F.C.C.2d 9 (1977) (announcing sweeping review of economic relationship between cable and broadcast television industries).[7] These inquiries resulted in two extensive staff reports advocating elimination of the rules, *Report in Docket No. 20988, Cable Television Syndicated Program Exclusivity Rules*, 71 F.C.C.2d 951 (1979), and *Report in Docket No. 21284, Inquiry into the Economic Relationship Between Television Broadcasting and Cable Television*, 71 F.C.C.2d 632 (1979) [hereafter "Economic Inquiry Report"]. After considering several econometric and case studies concerning the impact of cable television on local station audiences and future cable penetration rates, the Commission found that the impact on broadcasting stations from the deregulation of cable television would be negligible, and that consumers would be decidedly better off due to increased viewing options from the greater availability of expanded cable services.

In conjunction with the release of these reports, the FCC initiated an informal notice-and-comment rulemaking proceeding to eliminate the distant signal and syndicated exclusivity restrictions. *Notice of Proposed Rule Making in Docket Nos. 20988 and 21284*, 71 F.C.C.2d 1004 (1979). After widespread public comment and administrative reevaluation, it issued the Report and Order, which adopted the proposal for repeal with three commissioners dissenting in whole or in part. The FCC also rejected a suggestion of the National Telecommunications and Information Administration (NTIA) of the United States Department of Commerce that it impose a "retransmission

---

**6.** For instance, in 1977, total production costs of the three networks and all television stations were $2,878 million, and the cost of packaged programs, that is, the expenses of purchasing programs from independent producers, was $1,482 million. *Notice of Proposed Rule Making in Docket Nos. 20988 and 21284, supra*, 71

F.C.C.2d at 1018; *see generally* R. Noll, *et al., supra* at 63–79.

**7.** This reevaluation was further prompted by *Geller v. FCC, supra*, 610 F.2d at 980, which required the FCC to review the necessity of retaining the syndicated exclusivity rules.

consent" requirement on cable systems if it eliminated the distant signal and syndicated exclusivity rules. Under that proposal, cable operators would need the consent of the originating broadcast station before they could transmit non-network programming to their subscribers.[8] Both the United States Department of Justice and the United States Copyright Office opposed the NTIA proposal as contrary to Congress's mandate of a compulsory licensing system for cable television under the new Copyright Act, and the FCC adopted their view.

## II.

 Petitioners challenge the Commission's Report and Order, among other grounds, for seriously misconstruing the mandate of the 1976 Copyright Act and for being arbitrary and capricious. We conclude that a fair reading of the Copyright Act supports the FCC's position and that the FCC's action was neither arbitrary nor capricious. While the deregulation of the cable television industry raises serious policy questions, evidenced by the sharp division within the Commission as to the conclusions of the Report and Order, these questions are best left to the agencies that were created, in large part, to resolve them.

*FCC Authority Under the Copyright Act*

Petitioners' substantive argument concerning the FCC's interpretation of its regulatory authority over cable television under the Copyright Act is two-pronged: (1) that the Act's compulsory licensing system was premised on maintenance of the existing regulatory framework and (2) that the Act does not prohibit adoption of a retransmission consent requirement. These claims are based on passages in the Act and its legislative history, allegedly indicating Congress's intention to leave the FCC with free rein to readjust inter-industry relations by regulation. Specifically, petitioners re-

fer to the provision establishing the compulsory license, § 111, which premises the license upon the "carriage of signals . . . permissible under the rules, regulations, or authorizations of the Federal Communications Commission." 17 U.S.C. § 111(c)(1). Petitioners contend that this language implies both that the FCC cannot upset the existing framework restricting the amount of programming cable systems can carry, and that the Commission can adopt rules conditioning cable retransmission upon receipt of broadcaster consent, as the NTIA proposed, because the compulsory license covers only signals the FCC permits cable systems to carry pursuant to Commission rules. Petitioners further rely on a passage in the report of the House Judiciary Committee, which stated that the Committee did not intend to "interfere" with FCC rules or communications policy, and that the FCC should neither read the copyright legislation to touch on issues such as increased distant signal carriage, nor rely on it to enact any significant changes in the existing "delicate balance" of regulation in areas where Congress had not resolved the issue. H.R.Rep.No.1476, *supra* at 89, [1976] U.S.Code Cong. & Ad.News at 5703–04. From these glimmerings of legislative intent, petitioners contend that the legislative scheme will not tolerate repeal of the distant signal or syndicated exclusivity rules, but will accept a retransmission consent requirement.

 We reject both contentions. Though Congress was aware of the underlying regulations restricting cable transmissions when it adopted the compulsory licensing system, it also recognized the legitimacy within the statutory plan of FCC modifications of that regulatory structure. Congress provided that the Copyright Royalty Tribunal ("Tribunal"), the entity established to collect and distribute the royalty

---

**8.** The NTIA proposal would have required consent for only new and expanding cable systems and would have grandfathered existing systems because they were built on the basis of either no or partial copyright liability. On this appeal petitioners do not seem to envision such a limited retransmission consent rule, though their arguments are not directed to the content of such a regulation but rather to the FCC's ability to impose a consent requirement in general.

fees, could readjust the statutory royalty rate if the FCC altered either the distant signal or syndicated program exclusivity rules. 17 U.S.C. §§ 801(b)(2)(B) and (C) (1976). The plain import of § 801 is that the FCC, in its development of communications policy, may increase the number of distant signals that cable systems can carry and may eliminate the syndicated exclusivity rules, in which event the Tribunal is free to respond with rate increases.

The views expressed in the House Report do not call for a different construction. Though perhaps revealing concern for congressional etiquette among the several committees with overlapping jurisdiction over the regulated subject matter, the comments do not foreclose the FCC's decision to repeal the distant signal and exclusivity rules. In repealing its rules, the FCC has heeded the Committee's caution against using the 1976 copyright legislation to determine matters that Congress "did not resolve." The FCC did not base its repeal of the cable regulations solely upon the revision, but upon a careful reassessment, in light of all the evidence, of the gains and losses to the public interest from deregulation.

█ While the Commission is not obliged by the Act to preserve existing rules, it is not free to adopt a new one that would be inconsistent with a basic arrangement of the new legislation. Retransmission consents would undermine compulsory licensing because they would function no differently from full copyright liability, which Congress expressly rejected. Under the NTIA proposal cable operators would be forced to negotiate individually with numerous broadcasters and would not be guaranteed retransmission rights, a scenario Congress considered unworkable when opting for the compulsory licensing arrangement.[9] H.R.Rep.No.1476, *supra* at 89, [1976] U.S.Code Cong. & Ad.News at 5704; *see* Comment, *Regulatory Versus Property Rights Solutions for the Cable Television Problem, supra* at 550. A rule imposing a retransmission consent requirement would also directly alter the statutory royalty formula by precipitating an increase in the level of payments of cable operators to obtain consent for program use. Such a rule would be inconsistent with the legislative scheme for both the specific compensatory formula and the appropriate forum for its adjustment. In an era of compulsory copyright licensing,[10] we find it difficult to imagine that Congress intended its formula for royalty fees to be only a minimum subject to FCC alteration, since it delegated broad discretionary authority to the Tribunal, and not the FCC, to readjust the rates if regulatory action so required. Congress did not specifically set the royalty rate for other types of compulsory licenses established under the new Act. *See* 17 U.S.C. § 118 (1976) (public broadcasting royalty rates set by Tribunal). To hold that the compulsory license formula sets only a minimum, and not a maximum rate (subject to Tribunal adjustment), would undermine the carefully established legislative arrangement.[11]

---

**9.** The FCC's experiment with a retransmission consent approach to the problem bears out Congress's concerns. In 1968 the FCC suspended the hearing process required by its 1966 rules in favor of compliance with then proposed rules requiring cable systems in the top 100 markets to obtain consent from distant stations before transmitting their signals. *Notice in Docket No. 18397*, 15 F.C.C.2d 417 (1968). This experiment resulted in virtually all denials of retransmission rights, leading the period to be known as the "freeze" on cable growth. *See Economic Inquiry Report, supra*, 71 F.C.C.2d at 651. There would be little difference as to feasibility considerations whether consent had to be obtained from program producers, which was Congress's focus, or broadcast stations.

**10.** The 1976 Copyright Act provided for blanket licensing in several contexts in addition to cable television. *See* 17 U.S.C. § 116 (1976) (juke boxes); *id.* § 115 (mechanical royalties); *id.* § 118 (public broadcasting).

**11.** Because we find that the FCC's rejection of a transmission consent requirement was based on a proper construction of the Copyright Act, we do not reach petitioners' further contentions that such a requirement, if not prohibited by the Copyright Act, would be permissible under the Communications Act, 47 U.S.C. § 151 *et seq.* (1976).

*Review of the FCC's Rulemaking Process*

Apart from arguments based on the Copyright Act, petitioners contend that the FCC's determination to repeal the cable television regulations should be set aside as arbitrary and capricious. 5 U.S.C. § 706(2)(A) (1976). The scope of judicial review of informal rulemaking under the Administrative Procedure Act is circumscribed. Though a reviewing court is to be "searching and careful" in its inquiry to ensure that the agency has articulated a "rational connection between the facts found and the choice made," *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962), it cannot substitute its judgment for that of the agency. *Citizens to Protect Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).

The Report and Order repealing the cable television regulations followed several years of thorough study by FCC staff and extensive public commentary, both before and after reports of findings were issued in 1979. Numerous econometric studies, as well as case studies of existing markets where cable systems had been less strictly regulated because of "grandfathering" provisions in the FCC regulations,[12] were carefully evaluated in reaching the administrative decision. Petitioners challenge the FCC's use of the vast material compiled in the proceeding as biased and irrational, contending that the FCC's conclusion that broadcasting stations would not be injured from cable deregulation was unfounded, and that the FCC failed to consider fully, or impartially, data projecting its decision's adverse economic impact on station finances and program supply. For example, the professional sports leagues claim the Commission did not consider the effect of deregulation on sports programming; the independent television stations charge it with viewing the industry as a whole, thereby ignoring the adverse impact on independents; and American Broadcasting Companies, Inc.

("ABC") contends that the FCC failed to consider the effects of deregulation upon different groups of viewers.

The FCC specifically responded to petitioners' factual and theoretical assertions in the Report and Order, articulating clear reasons when it rejected, or did not fully use, the economic predictions in industry studies due to erroneous assumptions or modeling flaws. *E. g., Economic Inquiry Report, supra*, 71 F.C.C.2d at 677–78 (rejecting certain results of Wharton Econometric Forecasting Associates study for National Association of Broadcasters because it used a formula that biased results toward smaller independent stations), *reasserted in Report and Order, supra*, 79 F.C.C.2d at 696. It commissioned an outside economist to reanalyze the data in his study, one on which the FCC's 1979 reports relied, after incorporating industry criticisms of his techniques; his results were unchanged. Appendix B, *Report and Order, supra*, 79 F.C.C.2d at 827 (Rand Note, prepared for FCC by R. Park). The Report and Order thus reasserted the 1979 reports' conclusion that unregulated cable television would divert less than ten per cent of local station audiences, a result that would have only a slight effect on broadcasting industry revenues and the supply of programming. We cannot conclude that this finding was arbitrary or capricious. The Commission offered a rational explanation for its policy founded on a predictive judgment well within its authority. *See FCC v. WNCN Listeners Guild*, —— U.S. ——, 101 S.Ct. 1266, 67 L.Ed.2d 521 (1981).

■ Nor do we think the FCC assigned too little significance to, or overlooked, any of the contentions by any of the pertinent segments of the industry. While independent stations are less profitable than network affiliates, there were data indicating that local affiliates were subject to greater audience diversion than independents, *e. g.*, R. Noll, *et al., supra* at 162–69, that UHF stations, most of which are independent,

12. Under 47 C.F.R. §§ 76.65 and 76.99 (1980), the regulations regarding distant signal and syndicated exclusivity, respectively, were made inapplicable to signals being transmitted by cable systems prior to March 31, 1972.

benefited from cable television in terms of improved viewing quality, *e. g., id.* at 166, and that independent stations in the grandfathered markets prospered, *Economic Inquiry Report, supra,* 71 F.C.C.2d at 698–701. Though in the past the FCC has accorded special treatment to UHF stations, it is not required to do so when in its judgment the public interest would be disserved; the FCC's statutory directives are to promote a "rapid, efficient" nationwide communications service and to encourage its use in the "public interest," 47 U.S.C. §§ 151, 303 (1976), neither of which commands a specific industry structure or protection of any particular stations from financial difficulty or even failure. Moreover, the FCC reviewed the circumstances of broadcast stations that filed comments alleging current or potential injury from cable television and found that cable had not adversely affected those stations. *Economic Inquiry Report, supra,* 71 F.C.C.2d at 711. The concerns of independent broadcasters were adequately considered by the FCC and did not require retention of either set of rules.

■ The independent stations further maintain that the FCC should have grandfathered existing syndicated program exclusivity contracts. The FCC was not required to take such action upon elimination of the exclusivity rules. The property of regulated industries is subject to such limitations as may reasonably be imposed in the public interest, and consequently, as numerous courts have recognized, regulations may be adopted that abolish or modify preexisting interests. For example, in *General Telephone Company of the Southwest v. United States,* 449 F.2d 846, 863–64 (5th Cir. 1971), FCC rules were upheld requiring telephone companies to divest their interests in cable television systems; in rejecting a grandfathering claim, the Court stated that the FCC should not be limited to building on the status quo when seeking to impose a regulatory policy. Moreover, in deciding not to grandfather existing exclusivity rights, the Commission considered evidence indicating that these exclusivity rights were rarely asserted.

■ The sports programming issue was not as thoroughly reviewed by the Commission in the preliminary stages of the rulemaking process as other issues, such as the effect on independent stations, because no change in the primary means of sports program protection, the home broadcast blackout rules, 47 C.F.R. § 76.67 (1980), was ever contemplated. However, the Commission did respond to the sports leagues' comments in the Report and Order. The leagues contend that cable television, by making available more broadcasts of games from distant cities when a club is playing at home, will decrease gate receipts, threaten the league concept by hurting weaker franchises, and ultimately lead to less sports programming. But the leagues did not produce any evidence that the number of sports broadcasts by home clubs has been reduced in the existing areas of high cable penetration, or would be reduced in the future. Further, as the FCC noted, many variables besides the availability of sports programming on television influence gate attendance, such as the weather and the caliber of the home and visiting teams. It was not arbitrary for the FCC to conclude that sports programming requires no special protection after the repeal of the distant signal rules.

■ Finally, the FCC's action is not deficient, as ABC contends, for lack of precise assessment of the impact of repeal on discrete groups of viewers. While the FCC did not conduct detailed demographic studies of cable and noncable television audiences, this fact does not lessen the validity of its conclusion that deregulation is in the public interest. Though lower-income families benefit more from a system of free television than from cable television, *see* R. Noll, *et al., supra* at 25–26, the expansion of cable services was reasonably found not to threaten the basic nature of free television. Given current and estimated cable penetration rates and the profitability of the broadcasting industry, we do not doubt the reasonableness of the FCC's conclusion that programming on free television will not substantially change or diminish after de-

regulation.[13] If free television retains its existing programming, then there is an increase in overall consumer welfare and no significant inequity among groups of viewers from the FCC's decision: those who do not purchase cable are substantially unaffected in their viewing patterns, while those who do, being able to pay for programming, some of which does not generate sufficient mass appeal to be aired on free television, receive a service more responsive to their viewing preferences. *See id.* at 136.[14]

Ultimately, the task in adopting rules to achieve the appropriate mix between broadcast and cable services requires determining a desired tradeoff between the inefficiency of the pricing system of cable television and the inadequacy of programming under free television.[15] Since the marginal cost of programs for an extra viewer is zero, any price paid by a cable subscriber for receiving television signals is inefficient.[16] Though free television is price efficient, because advertisers and not viewers pay for programming, the pricing does not reflect the

intensity with which viewers prefer to see certain types of shows. *See* Spence & Owen, *Television Programming, Monopolistic Competition and Welfare,* 91 Q.J.Econ. 103 (1977). Free television consequently limits program diversity by its concentration on mass audience shows, which make advertising worthwhile. In shifting its policy toward a more favorable regulatory climate for the cable industry, the FCC has chosen a balance of television services that should increase program diversity, a valid FCC regulatory goal, *see FCC v. National Citizens Committee for Broadcasting,* 436 U.S. 775, 795–97, 98 S.Ct. 2096, 2112–13, 56 L.Ed.2d 697 (1978); *United States v. Midwest Video Corp.,* 406 U.S. 649, 669, 92 S.Ct. 1860, 1871, 32 L.Ed.2d 390 (1972) (plurality opinion). While there will undoubtedly be more of the same type of mass audience programming now populating the national networks on cable channels as well, the unlimited number of cable channels holds out the best possibility for special interest programming. As the market shares for

**13.** As in *Home Box Office, Inc. v. FCC,* 567 F.2d 9 (D.C.Cir.) (*per curiam*), *cert. denied,* 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977) (vacating FCC rules restricting pay cable showing of certain feature film and sports programming), there was no significant evidence presented of program siphoning.

**14.** Although in a system of only pay television (whereby the viewer pays per program or per channel, and not simply a cable subscription and installation fee) the distributional effect would be to shift income from consumers to the television industry, under a cable system consumers gain, and it is the broadcasting network segment that loses due to increased competition from independent stations. R. Noll, *et al., supra* at 135, 173–74, 182.

**15.** The bulk of the empirical data supports the FCC's position that deregulation will have only a negligible adverse impact on broadcast programming, but plausible economic arguments can be and were made on both sides. Because television is in the nature of a "public good," that is, an increase in the amount available for consumption by one viewer does not reduce the amount available for consumption by other viewers, the marketplace may not produce the optimal mix of programming. *See* Besen, Manning & Mitchell, *supra* at 83; Samuelson, *Aspects of Public Expenditure Theories,* 40 Rev. Econ. & Stat. 332 (1958); Samuelson, *The Pure Theory of Public Expenditure,* 36 Rev.Econ. &

Stat. 387 (1954). The distant signal and syndicated exclusivity rules, in the absence of full copyright liability for cable operators, could function to avoid the problems involved in the private production of a public good like television, by excluding nonpurchasers, who would otherwise be able to enjoy a "free ride" by freely consuming the good and letting others pay for it. *See* Demsetz, *Private Production of Public Goods,* 13 J.L. & Econ. 293 (1970). Economists differ over the effect of eliminating these rules on the supply of programming, and consequently, on the gains in public welfare from pursuing such a regulatory policy. *Compare* R. Noll, *et al., supra* at 66–67, 149 (program supply will not be affected because producers currently receive excessive rents, and may even increase with expansion of cable) *and* Spence & Owen, *Television Programming, Monopolistic Competition and Welfare,* 91 Q.J. Econ. 103 (1977) (program supply will increase from larger market given relatively unlimited channel capacity of cable), *with* Besen, Manning & Mitchell, *supra* at 81, 85 (program supply will be reduced because program producers cannot collect full value of their work).

**16.** In economic terms, price equals marginal cost in competitive equilibrium. *See generally* W. Nicholson, *Microeconomic Theory* (2d ed. 1978).

**1152**

mass audiences are divided up among the several stations, programming will be purchased to capture the next largest share, selective audiences, see R. Noll, et al., supra at 151; Spence & Owen, supra, and programs will be supplied when revenues exceed cost and not only when a specified audience size is attained, as under the advertiser-supported system.

The Commission's repeal of the distant signal and syndicated exclusivity rules, after widespread participation of all industry segments and comprehensive evaluation of technical data, reflects the "rational weighing of competing policies" Congress intended to be exercised by the agency and to be sustained by a reviewing court.[17] See FCC v. National Citizens Committee for Broadcasting, supra, 436 U.S. at 803, 98 S.Ct. at 2116.

*Burden of Proof in the Proceedings*

■ Petitioners raise one further contention that merits attention. They argue that the FCC impermissibly shifted the burden of proof in its rulemaking proceeding to those parties seeking retention of the regulations. We disagree. After an extended inquiry into the effect of the existing regulations and the state of the industry that encompassed several years of investigation, and thorough consideration of the vast material compiled, the FCC concluded that the existing regulations should be repealed. Only after receiving that evidence did the FCC ask members of the public who disagreed with its findings to produce data showing how they would be injured by deregulation since it had not found any evidence to that effect. Such action did not reverse the burden of proof because the FCC had already produced an overwhelming mass of evidence supporting elimination of the rules. Rather, its request for data, evincing a desire for widespread participation from all interested segments of the public who might be aware of information that the agency's intensive inquiry did not

uncover, reflects the proper exercise of reasoned decisionmaking.

The petition to set aside the Report and Order is denied.

---

17. As one commentator has noted, the more the question of agency choice comes to resemble a political process, weighing claims of competing interest groups, the less the apparent justification for judicial supervision of Congress's delegation of choice to the agency. Stewart, *The Reformation of American Administrative Law*, 88 Harv.L.Rev. 1667, 1787 (1975).