674 F.2d 160
 WESTERN UNION TELEGRAPH COMPANY, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents.
RCA Global Communications, TRT Telecommunications Corp., The
Western UnionInternational, Inc., Trans-Lux Corporation, ITT
World Communications, Inc.,International Business Machines
Corporation, Intervenors.
 No. 342, Docket 81-4122.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 25, 1982.
Decided March 12, 1982.
 
 Milton J. Grossman, Washington, D. C. (Joel Yohalem, Arthur H. Simms, Washington, D. C., of counsel), for petitioner Western Union.
 John E. Ingle, Deputy Associate Gen. Counsel, F. C. C., Washington, D. C. (Stephen A. Sharp, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, F. C. C., Washington, D. C., of counsel), for respondent F. C. C.
 Marshall C. Berger, New York City (Weisman, Celler, Spett, Modlin & Wertheimer, New York City, of counsel), for intervenor Trans-Lux Corp.
 William T. Lake, Washington, D. C. (J. Roger Wollenberg, Roger M. Witten, Michael S. Schooler, Wilmer, Cutler & Pickering, Washington, D. C., J. Gordon Walter, Susan C. Diyanni, I.B.M. Corp., Armonk, N. Y., of counsel), for intervenor I.B.M.
 E. Edward Bruce, Thomas William Mayo, Covington & Burling, Roderick A. Mette, Vice President & Counsel, TRT Telecommunications Corp., Washington, D. C., of counsel, for Intervenor TRT Telecommunications Corp.
 Before MESKILL and WINTER, Circuit Judges, and HOLDEN, District Judge.*
 MESKILL, Circuit Judge:
 
 
 1
 Western Union Telegraph Company ("WUT") petitions for review of an order of the Federal Communications Commission ("Commission") which permits international record carriers ("IRCs") to "detariff" their offerings of terminal equipment, claiming that the order is arbitrary and capricious and an abuse of discretion. WUT's basic contention is that the order constitutes a "drastic and totally unexplained departure from the rulings that the Commission had made a little over a year earlier." Brief for WUT at 23.
 
 
 2
 The issues in this case relate to Commission regulation of domestic and international telex services.[1] To understand better WUT's and intervenor Trans-Lux Corporation's challenges to the Commission's order, we will discuss briefly the background against which that order was entered.
 
 The Industry Structure Before 1980
 
 3
 Telex is a service for the carriage of two-way typewritten and data communications, sometimes called "records," between stations of subscribers. See Western Union Telegraph Co., 49 F.C.C.2d 532, 534-35 (1974). Subscribers dial the numbers of other subscribers to exchange written messages on their terminal equipment, usually teletypewriters, in the same way that telephone customers dial each other to exchange voice messages. The order under review is the latest in a series of related Commission orders designed to change the structure of the telex industry in the United States.
 
 
 4
 Prior to this series of orders, the industry was divided into two segments.[2] WUT was the dominant provider of telex services between points in the United States, but was prevented by statute from providing international service. See Western Union International, Inc. v. FCC, 544 F.2d 87 (2d Cir. 1976), cert. denied, 434 U.S. 903, 98 S.Ct. 299, 54 L.Ed.2d 189 (1977); ITT World Communications Inc. v. FCC, 621 F.2d 1201, 1202 (2d Cir. 1980). Telex transmissions between points in this country and points abroad were provided by the IRCs. The IRCs were authorized to operate directly in only five "gateway" cities ("gateways") in the United States. In those cities, IRCs could place terminals connected to their networks which would permit customers to send or receive telex messages directly to or from points abroad. International communications originating or terminating in areas of the United States outside the gateways (the "hinterland") traveled to and from an IRC terminal in a gateway through the network of a domestic carrier, usually WUT.[3]
 
 
 5
 WUT's network was connected to those of all of the IRCs, but the IRCs' networks were not connected to each other. While a customer in a gateway could deal directly with an IRC, it could also, if it preferred, pass messages to an IRC's international network through WUT for no extra cost. Because the IRC networks were not interconnected, and because the IRCs competed with WUT for the domestic segment of international telex services in the gateways, the IRCs had significant incentives to place terminals connected to their individual networks in as many business offices as possible.
 
 
 6
 One device the IRCs used to induce customers to take their terminals was the "bundled" tariff, which combined terminal equipment and access lines with transmission service for a single, packaged price. Bundled tariffs allowed the IRCs to provide equipment virtually without charge, recovering the costs of both service and equipment through their per-minute usage rates. Since the IRCs provided essentially cost-free equipment, a customer had little to lose by accepting a terminal, and thereby acquiring access to the network of an IRC, even if it already had a terminal of another IRC. These terminal "give-a-ways" resulted in an inefficient duplication of IRC terminals in customer locations and in excessive usage rates.
 
 
 7
 The bundled tariffs also gave the IRCs a competitive advantage over WUT in the market for the domestic segment of international telex services in the gateways. Because the IRCs offered terminals at little or no cost, customers in gateways who required even a small amount of international service would be inclined to take a terminal from an IRC, thus bypassing the WUT network.
 
 The Gateways and Unbundling Orders
 
 8
 In 1980, the Commission released two related orders designed to alter the "rather convoluted", Western Union Telegraph Co. v. FCC, 665 F.2d 1126, at 1134 (D.C.Cir.1981) (hereinafter "Unbundling Review Decision"), structure of the telex industry in the United States. The first, International Record Carriers' Scope of operations in the Continental United States, 76 F.C.C.2d 115 (1980) (hereinafter "Gateways Order "), authorized the IRCs to pick up and deliver international messages in twenty-one new "points of operation" in the United States in addition to the five gateways.[4] This expansion of IRC areas of activity was conditioned upon the unbundling of IRC charges for terminals from the per-minute transmission rates and upon interconnection on demand of the networks of the various IRCs. These conditions were set forth in the second Commission order, Interface of the International Telex Service With the Domestic Telex and TWX Services, 76 F.C.C.2d 61 (1980) (hereinafter "Unbundling Order "). Both of these orders were affirmed by the United States Court of Appeals for the District of Columbia Circuit in the Unbundling Review Decision.
 
 
 9
 The Gateways Order was designed to enhance competition in the domestic handling of international communications in order to provide consumers with better and less costly service. See Gateways Order, 76 F.C.C.2d at 137. The Commission believed, however, that if IRC domestic activity was expanded under the bundled rate structure, "the market for terminal machines would be further skewed by extension of the effects of IRC market power in the international segment to the terminal market." Unbundling Order, 76 F.C.C.2d at 66-67. Therefore, in the Unbundling Order the Commission required the IRCs to file separate cost-based tariffs for transmission services, terminals and access lines. The Commission also believed that unbundling the tariffs would "insure fair competition among carriers operating in the domestic segment(,)" by preventing the IRCs from using their power in the international market "to subsidize the domestic portion of the service." Id.
 
 
 10
 As a final point in the Unbundling Order, the Commission gave notice that while it would temporarily continue to require the IRCs to file equipment tariffs, it had reached the "tentative conclusion" that regulation of terminal equipment was no longer necessary. The Commission cited "several reasons" for this conclusion:
 
 
 11
 First, we believe that our order today will enhance competition in the provision of international teleprinter equipment, and thus the protection which regulation might otherwise afford the ratepayer would be not only unnecessary but unduly burdensome. Second, in the unlikely event that the IRCs attempt to offer equipment below cost, antitrust liability would attach. Finally, the detariffing of terminal equipment in this area would be consistent with other policies we have recently expressed. Second Computer Inquiry, FCC 79-307, 72 F.C.C.2d 358, (Tentative Decision released July 2, 1979).
 
 
 12
 Unbundling Order, 76 F.C.C.2d at 82.
 
 The Order Under Review
 
 13
 After considering comments of interested parties, including the parties and intervenors in this action, the Commission released the order that is the subject of this appeal: Interface of the International Telex Service with the Domestic Telex and TWX Service, 86 F.C.C.2d 411 (1981) (hereinafter "Detariffing Order "). The Commission adopted as a final position the "tentative conclusion" expressed in the Unbundling Order that terminal equipment should be detariffed. Therefore, under the Detariffing Order, IRCs, just as domestic carriers, see Amendment of Section 64.702 of the Commission's Rules and Regulations (Second Computer Inquiry), 72 F.C.C.2d 358 (1979) (tentative decision), 77 F.C.C.2d 384 (1980) (final decision), 84 F.C.C.2d 50 (1981) (as modified on reconsideration), are now free to engage in unregulated competition in the sale and leasing of terminals. Transmission rates remain tariffed and subject to Commission control.
 
 DISCUSSION
 I. The Alleged Shift in Commission Policy
 
 14
 WUT's primary contention is that the Detariffing Order is inconsistent with the Unbundling Order. Thus, WUT claims that the Commission is required to explain more fully than it has its "abandonment of a specific regulatory control ( (terminal equipment tariffs) ) which, but a year earlier, the Commission had found absolutely necessary to make competition work fairly and effectively in the international telex market." Brief for WUT at 29, 38 (citing Office of Communication of the United Church of Christ v. FCC, 560 F.2d 529, 532 (2d Cir. 1977) ("(C)hanges in policy must be rationally and explicitly justified ....")).
 
 
 15
 WUT's argument is unpersuasive. It is clear that the Commission believed that the IRCs' bundled rate structure was inefficient, chiefly because it masked the true costs of the components of international telex services.
 
 
 16
 44. This is, indeed, the crux of the problem represented by the unified rate structure-it does not naturally assure that the costs of providing terminals and tielines are recovered from those who receive the benefit of those costs. From the IRC comments, it appears that this problem has manifested itself in at least two ways. First, the IRCs note that many of their customers routinely take teleprinters and tielines from two, three or more of the IRCs. Second, it appears that there are a fair number of customers who generate very low annual traffic volumes-sufficiently low, in fact, that larger-volume IRC subscribers are required to make up the deficit.
 
 
 17
 45. There is evidence that IRC-provided terminals and tielines are currently underused as a result of both of these phenomena. This is a matter of concern since telex terminal costs are not trivial. However, the precise level of current waste is not the most significant problem with the unified rate structure. Rather, the problem is that, by making those costs appear to be of no consequence, the rate structure does not force potential users to make an economic judgment as to what type of service meets their needs.
 
 
 18
 Unbundling Order, 76 F.C.C.2d at 78-79 (footnote omitted). Thus, "(t)he (Commission) determined that, as a policy matter, the cross-subsidies between consumer groups inherent in bundled rates were undesirable and should end." Unbundling Review Decision, at 1152.
 
 
 19
 The Commission also recognized in the Unbundling Order that an increase in the number of points of domestic IRC operation would be unfair to WUT if IRC rates remained bundled while WUT assessed separate, cost-based charges for terminal equipment and transmission service.[5]Indeed, with the addition of the 21 service points, the IRCs will be able to reach directly more than 75 per cent of Western Union's overseas telex customers. They will thus be able to expand the existing system of tielines passively attached to the IRC switch which the unified rate structure, has allowed them to develop. Were we to allow them to expand their domestic operations under the unified rate structure they would be able to offer large numbers of current Western Union customers the lure of what would appear to be free, or minimal-cost, terminals and undercut Western Union service.
 
 
 20
 Unbundling Order, 76 F.C.C.2d at 79. But shortly after the Unbundling Order was issued, the Commission released its final decision in Second Computer Inquiry, 77 F.C.C.2d 384, 446 (1980), which allowed domestic telex providers to detariff their terminal offerings. Thus, the competitive disadvantage to which WUT would have been subjected had IRC terminal offerings been detariffed when the Unbundling Order was issued had been eliminated by the time the Detariffing Order was released. WUT and the IRCs are now on the same competitive footing with respect to regulation of terminal offerings. Therefore, the Commission was amply justified in concluding that any previous need for regulation of IRC equipment offerings to protect WUT from unfair competition had vanished.[6]
 
 
 21
 The Commission ordered the IRCs to unbundle rates in an attempt to force the use of cost-based charges so that each consumer would pay the entire cost of its own use, but no more. The Unbundling Order did not, however, establish that the Commission believed regulation of equipment charges to be necessary. To the contrary, the Unbundling Order stated explicitly that "the provision of terminal equipment and tielines are not, conceptually, inextricable from overall telex service(,)" 76 F.C.C.2d at 78, and noted the Commission's "tentative belief that (it) should deregulate the provision of terminal equipment(,)" id. at 82. Therefore, WUT's claim that the Detariffing Order constitutes an unexplained departure from established Commission policy must be rejected.
 
 
 22
 II. Commission Reliance on Other Regulatory Tools
 
 
 23
 WUT charges that without requiring IRCs to file tariffs for their terminal offerings, the Commission will be unable to ensure that the goals of the Unbundling Order are achieved. More precisely, WUT charges that the Commission's stated intention to regulate the IRCs' transmission rates by starting a rate proceeding, if necessary, is inadequate. WUT claims that there has been no rate proceeding involving the IRCs since 1958 and that the records of the IRCs are in such disarray that a rate case would be impracticable. Moreover, WUT claims that given the Commission's alleged unwillingness to address the problem of IRC terminal "give-a-ways" through its tariff power, it is unreasonable to expect the Commission to use the complaint process and its investigatory powers to police the IRCs. Finally, WUT rejects as "fatuous" the Commission's suggestion of antitrust law and so-called "structural remedies" to prevent the IRCs from continuing the subsidization of terminal offerings through excessive transmission charges.
 
 
 24
 The Commission expressly considered and rejected WUT's arguments in the Detariffing Order, 86 F.C.C.2d at 418-20, thereby stating its belief that it will be able to regulate IRC transmission rates adequately without regulating terminal offerings. While WUT might believe that IRC transmission rates could be better controlled if equipment remained tariffed, the Commission has broad discretion to choose which regulatory tools to employ, see A.T. & T. v. FCC, 572 F.2d 17, 26 (2d Cir.), cert. denied, 439 U.S. 875, 99 S.Ct. 213, 58 L.Ed.2d 190 (1978), and its decision must be upheld unless it is irrational, see, e.g., Malrite T.V. v. FCC, 652 F.2d 1140, 1149 (1981); Philadelphia Television Broadcasting Co. v. FCC, 359 F.2d 282, 284 (D.C.Cir.1966). WUT suggests no reason why it will be more difficult to regulate IRC transmission rates without requiring equipment tariffs than to regulate WUT rates in similar circumstances. We cannot accept WUT's claim that the Commission acted irrationally in choosing to employ the same tools to regulate the IRCs that it uses to police WUT.
 
 
 25
 Moreover, WUT recognizes that the Commission may have been relying in part on the "structural remedy" of WUT's entry into the international telex market in direct competition with the IRCs to force transmission rates down and thereby eliminate the IRC's ability to subsidize equipment "give-a-ways." Reply Brief for WUT at 6-7. While this remedy was inchoate at the time in that it required an amendment to section 222 of the Communications Act that would permit WUT to operate internationally, see Western Union International, Inc. v. FCC, 544 F.2d 87 (2d Cir. 1976), cert. denied, 434 U.S. 903, 98 S.Ct. 299, 54 L.Ed.2d 189 (1977), such an amendment was enacted after the briefs in this case were filed, Record Carrier Competition Act of 1981, Pub.L.No. 97-130, amending Communications Act of 1934 § 222, 47 U.S.C. § 222 (1976). If the Commission exercises its power under the new legislation to authorize WUT to operate internationally, something that it has in the past shown an inclination to do, see ITT World Communications Inc. v. FCC, 635 F.2d 32, 45 (2d Cir. 1980); Western Union International, Inc. v. FCC, 572 F.2d 87, WUT will be on precisely the same competitive footing as the IRCs as far as the federal regulations in question are concerned. While the new legislation provides only "after-the-fact" justification for the Commission's action, the Commission's other explanations are sufficient by themselves to support the Detariffing Order. The new legislation does, however, reinforce our conclusion that a remand in this case would be futile.
 
 III. Section 203(c)
 
 26
 WUT's final claim is that the Detariffing Order is arbitrary and capricious because it contemplates rebating of the tariffed transmission charges in violation of section 203(c) of the Communications Act, 47 U.S.C. § 203(c) (1976). This claim is frivolous. Nothing in the Detariffing Order permits the IRCs to violate section 203(c) by selling terminals below cost. To the contrary, "the Commission stands ready to entertain complaints if this happens, and to issue appropriate ratemaking, structural or other regulatory orders." Brief for the Commission at 30. This argument appears to be merely another version of WUT's claim that the Commission will be unable adequately to police IRC transmission charges. In any case, if WUT believes that the IRCs are violating section 203(c), its proper remedy is to file a complaint with the Commission. The Commission can then commence an appropriate proceeding to resolve the factual questions inherent in a charge of illegal rebating.
 
 IV. Arguments of Trans-Lux Corporation
 
 27
 Trans-Lux Corporation, a manufacturer of terminal equipment, intervenes in support of WUT's position. While Trans-Lux's arguments largely restate the claims of WUT, Trans-Lux asserts as an independent ground for rejecting the Detariffing Order the alleged deleterious effect that detariffing will have on Trans-Lux.
 
 
 28
 In the Unbundling Order the Commission stated its tentative conclusion that "the provision of terminal equipment is not inextricably related to transmission, can be (and in fact is) offered by entities other than ... common carrier(s) providing transmission and is not what would traditionally be classified as a communications service." 76 F.C.C.2d at 82. This position was confirmed in Second Computer Inquiry, 77 F.C.C.2d at 450-51 (final decision), 84 F.C.C.2d at 65 (as modified on reconsideration), and in the Detariffing Order, 86 F.C.C.2d at 417-18. Trans-Lux offers nothing which casts doubt on the Commission's conclusion that the manufacture and provision of terminal equipment are highly competitive and involve many firms which are not communications carriers. To find in such circumstances that providing terminal equipment is not a communications service is hardly irrational.
 
 
 29
 Trans-Lux's claims amount to little more than an assertion that its business will be damaged by the deregulation of terminal equipment because the IRCs (and perhaps WUT) will offer terminals below cost, rendering Trans-Lux unable to compete. Whatever validity such a claim might have in an antitrust complaint, see generally, Cantor v. Detroit Edison Co., 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976), it has no relevance to this proceeding to review regulations of communications services.
 
 CONCLUSION
 
 30
 The Detariffing Order is a rational decision based upon relevant factors, see, e.g., United Church of Christ, 560 F.2d at 532, and is therefore affirmed.
 
 
 
 *
 Honorable James S. Holden, Chief Judge of the United States District Court for the District of Vermont, sitting by designation
 
 
 [1]
 As used in this opinion, "telex" refers to both telex and TWX, functionally similar services which are equivalent for the purposes of this case
 
 
 [2]
 For a more complete discussion of the history of the telegraph industry, see Western Union Telegraph Co. v. FCC, 665 F.2d 1126, 1130-1134 (D.C.Cir.1981) (hereinafter Unbundling Review Decision )
 
 
 [3]
 Actually, a customer in the hinterland could reach an IRC gateway station without using a domestic carrier. However, customers wishing to bypass the domestic carriers had to send their messages to gateways at their own expense. Because the use of a domestic carrier did not result in a charge to hinterland customers, it was normally preferred. See Unbundling Review Decision, at 1132
 
 
 [4]
 We refer to these new areas of IRC activity as "points of operation" rather than "gateways," to adhere to the terminology adopted by the Commission in the Gateways Order
 
 
 [5]
 When WUT acquired the TWX network from A.T. & T., it agreed to file separate, cost-based tariffs for terminal equipment and transmission services associated with both TWX and telex. See Western Union Telegraph Co., 24 F.C.C.2d 664, 668 (1970)
 
 
 [6]
 In that the Commission reasonably concluded that the detariffing of IRC terminal equipment was in the public interest, it was duty-bound to detariff even if it believed that doing so would be detrimental to the private interest of WUT. See, e.g., Hawaiian Telephone Co. v. FCC, 498 F.2d 771 (D.C.Cir.1974)