**NEW YORK STATE COMMISSION ON CABLE TELEVISION, Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents, Direct Satellite Communications, Inc., Time, Inc., National Satellite Cable Association, United Satellite Communications, Inc., WWHT Corporation, et al., Society for Private & Commercial Earth Stations, City of New York, Satellite Television Corporation, Board of Public Utilities, State of New Jersey, Suburban Cablevision, Minnesota Cable Communications Board, Intervenors.**

Nos. 83–2160, 83–2190 and 83–2196.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 6, 1984.

Decided Nov. 30, 1984.

John H. Reichman, New York City, with whom Edward P. Kearse and Peter Bienstock, New York City, were on brief, for petitioner.

Robert Alan Garrett, Washington, D.C., with whom Stephanie M. Phillipps, Washington, D.C., was on joint brief, for interve-

nor City of New York and amicus curiae The Nat. League of Cities, urging reversal. David H. Lloyd, Patrick J. Grant, and Elaine Lubin, New York City, also entered appearances for City of New York.

Gregory M. Christopher, F.C.C., Washington, D.C., with whom Bruce E. Fein, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, John E. Ingle, and Carl D. Lawson, F.C.C., Washington, D.C., were on brief, for respondents. Barry B. Grossman and Robert B. Nicholson, Dept. of Justice, Washington, D.C., entered appearances for respondent U.S.

Mark J. Tauber, Washington, D.C., with whom Deborah C. Costlow, Richard L. Brown, and Frederick W. Finn, Washington, D.C., were on brief, for intervenors Nat. Satellite Cable Ass'n, et al., in No. 83–2160.

Jack N. Goodman and Robert Trager, Washington, D.C., were on brief for intervenors United Satellite Communications, Inc., in Nos. 83–2190 and 83–2196.

J. Michael Miles, Asst. Atty. Gen., and Martha J. Casserly, Sp. Asst., Minn., St. Paul, Minn., were on brief for intervenor Minn. Cable Communications Bd.

Monica E. Olszewski, Short Hills, N.J., was on brief for intervenor Suburban Cablevision. Clement H. Berne, New York City, also entered an appearance for intervenor Suburban Cablevision.

Phillip L. Spector, Brattleboro, Vt., and Jeffrey H. Olson, Washington, D.C., were on brief for intervenor Direct Satellite Communications, Inc.

Margaret M. Foti, Princeton, was on statement in lieu of brief for intervenor Bd. of Public Utilities, N.J., in Nos. 83–2190 & 83–2196. Carla Vivian Bello, Newark, N.J., also entered an appearance for intervenor Bd. of Public Utilities, N.J.

John S. Hannon, Jr., Keith H. Fagan, Alan B. Sternstein, Richard E. Wiley, Lawrence W. Secrest, III, and Philip V. Permut, Washington, D.C., were on statement in lieu of brief for intervenor Satellite Television Corp.

Robert T. Perry and Donna A. Demac, New York City, were on brief for amici curiae Joseph Ferris, et al., urging reversal.

Ronald A. Siegel and Robert Clifton Burns entered appearances for intervenors WWHT Corp., et al.

Richard L. Brown, Frederick W. Finn, Washington, D.C., and Lauritz S. Helland, New York City, entered appearances for intervenor Society for Private and Commercial Earth Stations in Nos. 83–2190 & 83–2196.

Before TAMM, WILKEY, and EDWARDS, Circuit Judges.

Opinion for the court filed by Circuit Judge TAMM.

TAMM, Circuit Judge.

This is an appeal from a decision of the Federal Communications Commission (the Commission) to preempt state and local entry regulation of satellite master antenna television (SMATV). In a memorandum opinion and order issued November 17, 1983, the Commission held that the "potential for such state regulation to chill the development of SMATV service conflicts with our Congressional mandate, as embodied in the Communications Act, to foster the development of national communications service." *Earth Satellite Communications, Inc.*, 55 Rad.Reg.2d (P & F) 1427, 1434 (1983), *recon. denied*, FCC 84–206 (May 14, 1984). Petitioner New York State Commission on Cable Television and numerous intervenors (petitioners) contend that by refusing to give local jurisdictions the same regulatory control over SMATV as they have over traditional franchise cable, the Commission has exceeded its statutory authority and acted arbitrarily and capriciously. We find the Commission's decision a " 'reasonable accommodation of the conflicting policies' that are within the agency's domain," *Capital Cities Cable, Inc. v. Crisp*, — U.S. ——, 104 S.Ct. 2694, 2701, 81 L.Ed.2d 580 (1984) (quoting *United States v. Shimer*, 367 U.S. 374, 383, 81

S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961)), and therefore affirm the order in all respects.

## I. Background

The rapidly expanding cable industry has spawned a variety of methods by which cable viewing can be distributed to the public. "Traditional" or "franchise" cable systems use large remote antennas to capture television signals. The signals are distributed from the large antennas to viewers through coaxial cable laid under city streets or along telephone lines. Within the past decade, marketing innovations and advances in satellite and microwave technology have eliminated the need for the use of public rights-of-way to distribute "cable" viewing to some subscribers. Large apartment buildings and hotels can install a master antenna television (MATV) system which captures a television broadcast signal off the air and delivers it to tenants through coaxial cables that run through the buildings. In addition to improving normal television reception, MATV enables tenants to take advantage of the cable system involved in this litigation, satellite master antenna television (SMATV). SMATV transmits television signals from satellites directly to satellite receiving stations ("receive-only earth stations") atop multi-unit dwellings. The signal is converted to a usable frequency and distributed to subscribing tenants through the existing MATV system. A similar system, multipoint distribution service (MDS), beams microwave signals terrestrially to special antennas atop the buildings, and, like SMATV, uses the MATV system to distribute the signals to individual tenants. In the near future, satellite signals will be available to those who do not reside in large apartment dwellings. Direct broadcast satellite (DBS), potentially the most significant of the recent technological innovations, will provide direct satellite communication to individual homes, taking advantage of high-powered satellites and small, efficient earth receiving stations. *See National Association of Broadcasters v. FCC,* 740 F.2d 1190 (D.C.Cir.1984).

The Commission has allowed state and local governments some regulatory control over the franchising of "traditional cable" —cable systems that use public rights-of-way and telephone lines to distribute programming. State commissions, such as petitioner New York State Commission on Cable Television, have promulgated regulations governing the entry of cable television systems into the marketplace. In recent years, state and local regulators have endeavored to impose entry regulations upon cable systems, such as SMATV and MDS, that do not use the public rights-of-way. In 1977, however, the Commission preempted state entry regulation of MDS in *Orth-O-Vision, Inc.,* 69 F.C.C.2d 657 (1978), *recon.,* 82 F.C.C.2d 178 (1980), *aff'd sub nom. New York State Commission on Cable Television v. FCC,* 669 F.2d 58 (2d Cir.1982). The Commission refused, however, to extend its preemption ruling to other systems, such as SMATV, which also do not use public rights-of-way. 69 F.C.C.2d at 665.

Earth Satellite Communications, Inc. (ESCOM) builds and operates SMATV systems around the country. The programming ESCOM provides to its subscribers includes signals from television stations in Chicago and Atlanta and additional premium programs, such as the Movie Channel and ESPN. Joint Appendix (J.A.) 1. In 1983, ESCOM began installing a SMATV system in a 250-unit apartment building in East Orange, New Jersey, when Suburban Cablevision, a franchise cable television operator, sued in state court to enjoin the installation. Suburban Cablevision alleged that ESCOM violated the New Jersey Cable Television Act by installing its system without first obtaining a license from the New Jersey Board of Public Utilities. ESCOM contended that the New Jersey regulations did not apply to SMATV, and, even if they did apply, had been preempted by the Commission's 1977 *Orth-O-Vision* decision. J.A. 13–34. The court rejected ESCOM's arguments and entered an injunction prohibiting ESCOM from operating the SMATV system until it received a state certificate of approval. *Suburban Cable-*

*vision v. Earth Satellite Communications, Inc.*, No. C–1554–83E (N.J.Super.Ct.Ch.Div. May 20, 1983), J.A. 261–62.

ESCOM filed a petition with the Federal Communications Commission, urging it to extend the *Orth-O-Vision* decision to pre-empt state and local entry regulation of SMATV. J.A. 1. The Commission gave public notice of ESCOM's petition and received comments from over 25 interested parties. In a decision released November 17, 1983, the Commission declared that state and local regulation of SMATV that has "the effect of interfering with, delaying, or terminating interstate and federally controlled communications services" is preempted. *Earth Satellite Communications, Inc.*, 55 Rad.Reg.2d (P & F) at 1435.[1] After the Commission denied its request for a hearing, FCC 84–206 (May 14, 1984), the New York State Commission on Cable Television petitioned this court for review.

## II. DISCUSSION

### A. *Introduction*

■ Because the Commission has expressed its unambiguous intention to pre-empt state regulation of SMATV, our review on appeal is limited to determining whether the Commission had the authority to preempt state regulation and whether the preemption was a reasonable exercise of that authority. As the Supreme Court stated in *Capital Cities Cable, Inc. v. Crisp*, —— U.S. ——, 104 S.Ct. 2694, 2701, 81 L.Ed.2d 580 (1984), "if the FCC has resolved to pre-empt an area of cable television regulation and if this determination 'represents a reasonable accommodation of conflicting policies' that are within the agency's domain, ... we must conclude

that all conflicting state regulations have been precluded." (citation omitted). *See also Fidelity Federal Savings & Loan Ass'n v. De La Cuesta*, 458 U.S. 141, 153–54, 102 S.Ct. 3014, 3022–23, 73 L.Ed.2d 664 (1982) ("Federal regulations have no less preemptive effect than federal statutes. Where Congress has directed an administrator to exercise his discretion, his judgments are subject to judicial review only to determine whether he has exceeded his statutory authority or acted arbitrarily."); *Computer and Communications Industry Ass'n v. FCC*, 693 F.2d 198, 214 (D.C. Cir.1982) ("To determine whether the Commission acted properly in preempting state [regulation], ... we must examine the Commission's powers under the Act and the asserted justification for preempting state regulation."), *cert. denied*, 461 U.S. 938, 103 S.Ct. 2109, 77 L.Ed.2d 313 (1983).

### B. *The Commission's Authority*

■ Congress created the Commission in 1934 to regulate "communication by wire and radio so as to make available ... to all the people of the United States a rapid, efficient, Nation-wide and world-wide wire and radio communication service." 47 U.S.C. § 151 (1982). Although the Commission's general regulatory authority over cable television was originally in some doubt,[2] the Supreme Court in *United States v. Southwestern Cable Co.*, 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968), found that the Communications Act empowered the Commission to regulate cable television to the extent that it is "reasonably ancillary to the effective performance of the Commission's various responsibilities for the regulation of television broadcasting." *Id.* at 178, 88 S.Ct. at 2005. As the

---

**1.** The Commission announced that its preemption ruling did not extend to all state and local regulation of SMATV. State and local governments can regulate with respect to "zoning and public safety and health," for example, so long as it would not be "undertaken as a pretext for the actual purpose of frustrating achievement of the preeminent federal objective" favoring the development of broadband communications. Earth Satellite Communications, Inc., 55 Rad. Reg.2d (P & F) 1427, 1428 (1983), *recon. denied,*

FCC 84–206 (May ·14, 1984). The preemption ruling is limited to systems that operate on "one or more multiple unit dwellings under common ownership, control or management." *Id.* n. 3.

**2.** For an excellent overview of the Commission's early approach to the regulation of cable television, see *Malrite TV v. FCC*, 652 F.2d 1140 (2d Cir.1981), *cert. denied*, 454 U.S. 1143, 102 S.Ct. 1002, 71 L.Ed.2d 295 (1982).

Supreme Court recently stated in *Capital Cities Cable, Inc. v. Crisp*, —— U.S. ——, 104 S.Ct. 2694, 2701, 81 L.Ed.2d 580 (1984), "[w]e have since explained that the Commission's authority extends to all regulatory actions 'necessary to ensure the achievement of the Commission's statutory responsibilities.'" (quoting *FCC v. Midwest Video Corp.*, 440 U.S. 689, 706, 99 S.Ct. 1435, 1444, 59 L.Ed.2d 692 (1979)).

In its preemption order the Commission based its authority over SMATV upon the federal interest in "the unfettered development of interstate transmission of satellite signals." *Earth Satellite Communications, Inc.*, 55 Rad.Reg.2d (P & F) at 1432. This development would be frustrated, the Commission found, if each state could impose their own entry restrictions upon systems that were part of the national satellite network. *Id.* The Commission chose not to impose entry restrictions of its own, believing that open entry policies in the satellite field would create a more diverse and competitive telecommunications environment. *Id.* at 1433.

Petitioners do not challenge the general authority of the Commission to preempt state and local regulation of cable television in appropriate circumstances. Rather, they contend that, in this particular instance, because the Commission has failed to show that preemption is necessary "to ensure the achievement of the Commission's statutory responsibilities," *FCC v. Midwest Video Corp.*, 440 U.S. 689, 706, 99

S.Ct. 1435, 1444, 59 L.Ed.2d 692 (1979), it has acted beyond its authority. To support this contention, petitioners advance two closely related arguments. First, they contend that preemption of state and local regulation of SMATV is a reversal of well-established policy and therefore "presumptively" contrary to the achievement of the Commission's statutory responsibilities.[3] Second, petitioners contend that the policies underlying the Communications Act cannot be advanced by the Commission's determination to allow SMATV to enter the telecommunications marketplace unregulated. We reject both of these arguments and conclude that the Commission's action is not only consistent with prior Commission policy, but also a "'reasonable accommodation of conflicting policies' that are within the agency's domain." *Crisp*, 104 S.Ct. at 2701 (citation omitted).

1. The Allocation of Regulatory Responsibilities Between the Commission and State and Local Governments.

During the past twelve years, the Commission has given local jurisdictions significant control over the franchising of traditional cable systems. Petitioners contend that the Commission's refusal to give state and local governments the same amount of authority over SMATV as they have over traditional cable is a reversal of well-established policy.[4] Careful review of Commis-

---

**3.** *See Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983) ("A 'settled course of behavior embodies the agency's informed judgment that, by pursuing that course, it will carry out the policies committed to it by Congress. There is, then, at least a presumption that those policies will be carried out best if the settled rule is adhered to.'") (*quoting Atchison T. & S.F.R. Co. v. Wichita Board of Trade*, 412 U.S. 800, 807–08, 93 S.Ct. 2367, 2374–75, 37 L.Ed.2d 350 (1973)).

**4.** Although petitioners assert that various state interests would be served by allowing local control over cable television, the petitioners do *not* argue, as did the petitioners in *Capital Cities Cable, Inc. v. Crisp*, —— U.S. ——, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984), that the federal interest in preemption is outweighed by a countervailing

state interest. In *Crisp*, the Supreme Court held that Oklahoma's ban on television advertising of liquor, grounded in the twenty-first amendment, was preempted by federal regulations that required open access. This case, on the other hand, features a challenge by the cable industry and representatives of state and local governments to the Commission's action as being contrary to *national* communications policies. Petitioners contend that the state and local regulatory regimes should be upheld because they further communications policies as articulated by previous decisions by the Commission. As intervenor New York City and amicus curiae National League of Cities (New York City), opposing the Commission, stated, "[c]learly, the lawfulness of an agency's preemptory action turns upon the particular regulation's impact upon federal objectives—and not simply on the

sion precedent, however, reveals that the petitioners' argument ignores the critical distinction the Commission has made between cable television systems that use public rights-of-way and systems, like SMATV, that are operated solely on private property.

The Commission recognized in 1972 that direct federal licensing of the thousands of cable systems operating in large and small communities throughout the country would place "an unmanageable burden on the Commission." *Cable Television Report and Order*, 36 F.C.C.2d 143, 207 (1972). The physical realities of constructing cable systems—the use of public rights-of-way and the parcelling of large urban districts—made local governments a logical entity to share the regulatory burden.[5] The Commission therefore created a "deliberately structured dualism" whereby local governments would be responsible for selecting franchises, pursuant to minimum standards established by the Commission, while the Commission retained exclusive authority over all operational aspects of cable communication, including technical standards and signal carriage. *Id.* at 207–10.

As the Commission later explained, the 1972 rules "were an attempt to create a flexible regulatory framework that took into account the constant and necessary flux inherent in any emerging industry such as cable television." *Clarification of the Cable Television Rules*, 46 F.C.C.2d

175, 176 (1974). Although the Commission recognized that "the essentially local service offered by cable television, at least in its formative stages, could best be developed through local participation and enforcement," it cautioned that "the developing duplicative and burdensome overregulation of cable television" was of increasing concern. *Id.* at 188.

Following a comprehensive study of the effect of dual regulation upon the cable industry, the Commission in 1975 recognized the need for clarification of local governments' regulatory responsibilities. The Commission issued a ruling emphasizing cable television's use of public rights-of-way as the primary rationale for local control:

> The ultimate dividing line, as we see it, rests on the distinction between reasonable regulations regarding use of the streets and rights-of-way and the regulation of the operational aspects of cable communication. The former is clearly within the jurisdiction of the states and their political subdivisions. The latter, to the degree exercised, is within the jurisdiction of the Commission.

*Duplicative and Excessive Over-Regulation of Cable Television*, 54 F.C.C.2d 855, 861 (1975). The Commission made explicit its intention to preempt local regulation whenever necessary "to assure the orderly development of this new technology into the national communications structure." *Id.* at 863.[6]

---

degree of state and local interest in the regulation." Brief for New York City at 29 (emphasis deleted); *see also id.* at 13. *See also Fidelity Federal Savings & Loan Ass'n v. De La Cuesta*, 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982) (quoting *Free v. Bland*, 369 U.S. 663, 666, 82 S.Ct. 1089, 1092, 8 L.Ed.2d 180 (1962)) (in preemption cases the critical inquiry is whether " 'there is a conflict with a valid federal law' " and not the " 'relative importance to the state of its own law' ").

5. The Commission explained: "Moreover, local governments are inescapably involved in the process because cable makes use of streets and ways and because local authorities are able to bring a special expertise to such matters, for example, as how best to parcel large urban areas into cable districts." 36 F.C.C. at 207.

6. The Commission outlined the specific boundaries of regulation:

> The subject areas this agency has preempted include, of course, signal carriage, pay cable, leased channel regulations, technical standards, access, and several aspects of franchise responsibility.... Non-federal officials have responsibility for the non-operational aspects of cable franchising including bonding agreements, maintenance of rights-of-way, franchisee selection and conditions of occupancy and construction (within broad federal guidelines as to the latter two points).

54 F.C.C.2d at 863. In 1977 the Commission reaffirmed its authority over the setting of maximum franchise fees a local government could charge a cable system. This continued federal intervention was deemed necessary because of a

Under this dual regulatory framework, the Commission has consistently retained exclusive authority over those elements of cable television that do not involve the use of public rights-of-way. The Commission has retained exclusive authority over the licensing of ·the satellites that transmit SMATV signals, *see Network Project v. FCC*, 511 F.2d 786 (D.C.Cir.1975), and the earth stations that receive the satellite signals. *Second Report and Order*, 35 F.C.C.2d 844, 855 (1972). *See also Regulation of Domestic Receive-Only Satellite Earth Stations*, 74 F.C.C.2d 205, 217 (1979) (making licensing of receive-only earth stations voluntary). The Commission has preempted regulation of pay television programming services and rates, *Brookhaven Cable TV, Inc. v. Kelly*, 573 F.2d 765 (2d Cir.1978), *cert. denied*, 411 U.S. 904, 99 S.Ct. 1991, 60 L.Ed.2d 372 (1979), and the carriage of television broadcast signals. *Capital Cities Cable, Inc. v. Crisp*, —— U.S. ——, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984). As the Supreme Court stated in its unanimous *Crisp* decision, "[o]ver the past twenty years, pursuant to its delegated authority under the Communications Act, the FCC has unambiguously expressed its intent to preempt any state or local regulation of this entire array of signals carried by cable television systems." *Id.* at 2701.

A case similar to this appeal, *Orth-O-Vision, Inc.*, 69 F.C.C.2d 657 (1978), *recon.*, 82 F.C.C.2d 178 (1980), *aff'd sub nom. New York Commission on Cable Television v. FCC*, 669 F.2d 58 (2d Cir.1982), clearly demonstrates the Commission's willingness to preempt state regulation of systems that do not involve the use of public rights-of-way. *Orth-O-Vision* involved a cable system similar to SMATV, multipoint distribution service (MDS). Rather than bouncing its signal off of a domestic satellite, MDS delivers programming terrestrially by microwave. Like SMATV, MDS's primary market is large multi-unit dwellings in which individual units are wired to a rooftop antenna through the MATV network.

Orth-O-Vision, a company that markets HBO programming through a MDS-MATV system, was refused an operating permit from the petitioner in this case, New York State Commission on Cable Television (NYSCCT). It then petitioned the FCC to preempt state regulation of MDS. The Commission, after notice and opportunity for comment, issued a declaratory ruling preempting state and local regulations of MDS.

In its comments opposing Orth-O-Vision's petition, the NYSCCT argued, as it does in this case, that state regulation of MDS-augmented MATV would prevent MATV "from stifling the development of conventional cable systems in the same area or from securing an unfair competitive advantage over an already franchised system.". *Orth-O-Vision*, 69 F.C.C.2d at 663. The Commission held that this state objective— to protect franchised cable from competition by regulating MDS—was "an impermissible interference with interstate communications." *Id.* at 666.

In affirming the Commission's preemption, the Second Circuit found that by denying franchises, municipalities could curtail the development of MDS. *New York Commission on Cable Television v. FCC*, 669 F.2d 58, 63–64, 66 (2d Cir.1982). Since the Commission's policy of advancing the development of MDS was within its statutory authority, the Commission properly preempted conflicting state entry regulation. *Id.* at 66.

Petitioners argue vigorously that the *Orth-O-Vision* decisions are irrelevant to this appeal. First, petitioners contend that MDS is completely unlike franchised cable or SMATV. Brief for NYSCCT at 17. We agree that MDS is different from franchised cable in one critical respect: it is operated solely on private property and makes no use of public rights-of-way. Yet the only difference between MDS and SMATV is that SMATV bounces its signal

---

potential conflict between the states, tempted to view cable television as "a convenient revenue-producing enterprise," and the federal govern-

ment. *Applications for Certificate of Compliance*, 66 F.C.C.2d 380, 391–92 (1977).

off domestic satellites. Petitioners advance no theory as to why this relatively minor difference should compel the Commission to treat SMATV differently than MDS. Second, petitioners seize upon language in the *Orth-O-Vision* order that limits its preemptive impact to MDS systems. The question, however, is not whether the order in *Orth-O-Vision* preempted SMATV but whether the Commission's action in *Orth-O-Vision,* affirmed by the Second Circuit, establishes precedent for the preemption of state regulation of SMATV. The Commission's preemption of a cable system, which, like the system involved in this appeal, does not use public rights-of-way, plainly refutes petitioners' contention that the Commission has arbitrarily reversed well-established policy.[7]

### 2. Commission Reliance on Market Forces to Regulate SMATV

In a general challenge to the Commission's decision not to impose entry regulations upon SMATV, petitioners contend that the Commission has failed to show that its open entry policy is necessary for the achievement of its statutory responsibilities. Franchise cable television and SMATV have flourished under local regulation, they claim, and no federal interest would be promoted by allowing SMATV to compete unregulated with traditional cable.

■ Although the Commission does not have unbridled discretion to use the marketplace to regulate an industry under its control,[8] "the public interest touchstone of the Communications Act, beyond question, permits the FCC to allow the marketplace to substitute for direct Commission regulation in appropriate circumstances." *Wold Communications, Inc. v. FCC,* 735 F.2d 1465, 1475 (D.C.Cir.1984). *See also FCC v. WNCN Listeners Guild,* 450 U.S. 582, 101 S.Ct. 1266, 67 L.Ed.2d 521 (1981) (approving FCC reliance on market forces to promote diversity in entertainment programming); *Computer and Communications Industry Ass'n v. FCC,* 693 F.2d 198, 212 (D.C.Cir.1982) (approving the holding of *Western Union Telegraph Co. v. FCC,* 674 F.2d 160 (2d Cir.1982), that "newly un-

---

**7.** The *Orth-O-Vision* case also disposes of petitioner NYSCCT's claim that the elimination of entry regulation of SMATV is a reversal of the Commission's long-standing policy of "distributional equity." This policy, petitioner argues, requires cable operators to extend cable lines throughout the entire franchise district. The elimination of entry regulation thus constitutes a reversal of this policy because it will allow SMATV operators to serve only those who reside in large apartment buildings. As the Commission notes, however, the regulation upon which the petitioners in part base this "longstanding policy," 47 C.F.R. § 76.31(a)(2) (1976), was repealed in 1978. *Applications for Certificate of Compliance,* 66 F.C.C.2d 380, 392–93 (1977). Even while in force, the regulation " 'was not expected to guarantee full construction of the franchise area, which we recognized in some instances might be physically impossible or financially impracticable.' " Brief for the FCC at 24, *quoting* 66 F.C.C.2d at 393. Moreover, we fail to see how the "distribution equity" policy could sensibly be applied to SMATV. A franchise authority, having control over the public rights-of-way, can condition a grant of a franchise upon the agreement by the cable operator to make its service available to the entire community by extending cable lines along every right-of-way. Distribution of SMATV throughout a franchise district, however, is dependent not on the construction of cable lines along every public right-of-way but on the installation of an earth station on private property. A franchise authority can no more require the installation of earth stations on private property than it can require the installation of television sets or telephones. In any event, the Commission's 1978 *Orth-O-Vision* proceeding presaged preemption of local imposition of "distributional equity" requirements, thereby destroying any claims that the present action is a reversal of well-established policy. The Second Circuit's decision did not discuss the "distributional equity" argument; the preemption of MDS, however, involves the identical "distributional equity" concerns as the preemption of SMATV.

**8.** Clearly, the Commission cannot promote competition for competition's sake. Indeed, "[o]ne of the fundamental premises of the regulatory scheme such as that established by the Communications Act is that the free market cannot always be trusted to avoid a wasteful duplication of facilities contrary to the public good." *Telocator Network of America v. FCC,* 691 F.2d 525, 549 (D.C.Cir.1982). At the same time, however, "[t]o insist upon concrete proof that a proposed innovation will succeed without undesirable side effects would be effectively to relegate the Commission to preserving the status quo." *Id.* at 542.

leashed market forces" constitute a reasonable substitute regulatory tool), *cert. denied*, 46 U.S. 938, 103 S.Ct. 2109, 77 L.Ed.2d 313 (1983); *National Association of Regulatory Utility Commissioners v. FCC*, 525 F.2d 630, 645 (D.C.Cir.) (approving Commission's conclusion "that a competitive environment is the best and most feasible way to achieve its goal"), *cert. denied*, 425 U.S. 992, 96 S.Ct. 2203, 48 L.Ed.2d 816 (1976). Indeed, the Commission has increasingly come to rely upon market forces to regulate the entry and operation of new cable television systems. *See, e.g., New York Commission on Cable Television v. FCC*, 669 F.2d 58 (2d Cir. 1982) (affirming Commission preemption of state entry regulation of MDS); *Malrite T.V. v. FCC*, 652 F.2d 1140 (2d Cir.1981) (upholding Commission decision to allow unfettered importation of distant broadcast signals), *cert. denied*, 454 U.S. 1143, 102 S.Ct. 1002, 71 L.Ed.2d 295 (1982); *Brookhaven Cable TV, Inc. v. Kelly*, 573 F.2d 765 (2d Cir.1978) (affirming Commission preemption of state and local price regulation of special pay cable programming), *cert. denied*, 441 U.S. 904, 99 S.Ct. 1991, 60 L.Ed.2d 372 (1979).

Petitioners advance no credible argument to show that the market is an inappropriate tool for the Commission to choose in this instance to effectuate its statutory mandate. Competition, petitioner NYSCCT argues, will have a grave impact upon the existing cable franchises. The Commission's determination that SMATV should be allowed to serve residents of multi-unit dwellings cannot be challenged as contrary to the purposes of the Communications Act merely because some harm will be visited upon existing and developed franchises.[9] Measuring the public interest standard of the Communications Act with sole reference to the impact Commission action

would have upon a developed technology ensures a regulatory regime frozen into maintaining the status quo. We cannot read into the Communications Act a congressional intent to so prevent innovative technologies from conferring substantial benefits upon the viewing public. We therefore conclude that the Commission's present reliance on market forces to regulate the entry of SMATV into the cable television marketplace is consistent with its statutory mandate.

### 3. Conclusion

We find, therefore, that the preemption of state and local entry regulation of SMATV is well within the Commission's statutory authority. The Commission's preemption policy has been "shouted from the rooftops." *Brookhaven Cable TV, Inc. v. Kelly*, 573 F.2d 765, 768 (2d Cir.1978), *cert. denied*, 441 U.S. 904, 99 S.Ct. 1991, 60 L.Ed.2d 372 (1979). There has been no reversal of policy that might indicate that the Commission has strayed from any well recognized limits of their jurisdiction over cable television regulation. State and local entry regulation that has either the purpose or the effect of restricting the ability of SMATV operators to provide services to the public clearly conflicts with the policies articulated by the Commission and, therefore, are a proper subject of preemption.

### C. The Reasonableness of the Commission's Exercise of Authority

 Having established that preemption of state regulation of SMATV is within the Commission's statutory authority, we now consider whether in exercising its authority the Commission acted arbitrarily or capriciously. *Fidelity Federal Savings & Loan Ass'n v. De La Cuesta*, 458 U.S. 141,

---

**9.** As the Commission stated in CATV Syndicated Program Exclusivity Rules, 79 F.C.C.2d 663, 672 (1980), *aff'd sub nom. Malrite TV v. FCC*, 652 F.2d 1140 (2d Cir.1981), *cert. denied*, 454 U.S. 1143, 102 S.Ct. 1002, 71 L.Ed.2d 295 (1982):

We strongly emphasize, however, as we have on previous occasions that the Commission's underlying concern in regulation of both

broadcasting and cable television is "with the quantity and quality of video and telecommunications service that the public receives" and not, as some might erroneously perceive, "with shifting or safeguarding revenues or profits, or with the success or failure of any particular firm, industry, or technology." (footnotes omitted).

151–54, 102 S.Ct. 3014, 3021–23, 73 L.Ed.2d 664 (1982) (federal agency's decision to preempt "subject to judicial review only to determine whether he has exceeded his statutory authority or acted arbitrarily").[10] As this court recently stated in *Wold Communications, Inc. v. FCC*, 735 F.2d 1465, 1476 (D.C.Cir.1984), the proper inquiry under the arbitrary and capricious standard is "whether a reasonable person, considering the matter on the agency's table, could arrive at the judgment the agency made." *See also Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35 (D.C.Cir.) (court must ensure "both that the Commission has adequately considered all relevant factors ... and that it has demonstrated a 'rational connection between the facts found and the choice made'") (citations omitted), *cert. denied*, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977). Our discussion of the Commission's authority forecloses extensive inquiry into the rationality of its decision. A finding that the Commission has the power to preempt state regulation means that preemption is necessary for the full accomplishment of lawful Commission objectives. Establishing this logical relationship between the action taken—preemption—and Commission policy involves, at least to a certain extent, the determination that the Commission has not acted arbitrarily or capriciously. Furthermore, the nature of this preemption action obviates extensive analysis of the facts upon which the determination was reached: the parties do not so much dispute the factual circumstances surrounding the cable industry as the kind of regulation that should or should not be imposed upon the existing and emerging cable systems. Yet, if the Commission has chosen rationally among competing policies, we cannot reverse because we would have chosen other means of effectuating the congressional mandate. As the Supreme Court stated in *United States v. Allegheny-Ludlum Steel Corp.*, 406 U.S. 742, 749, 92 S.Ct. 1941, 1946, 32 L.Ed.2d 453 (1972), "we do not inquire into the wisdom of the regulations that the Commission promulgates, and we inquire into the soundness of the reasoning by which the Commission reaches its conclusions only to ascertain that the latter are rationally supported."

Petitioner NYSCCT claims that there is inadequate evidence in the record to justify the Commission's conclusion that state and local regulations actually impede the growth of SMATV. The petitioner's comments to the Commission, however, betray the weakness of its contention. The petitioner argued that "[t]he principal evil of allowing private cable to exist outside the regulatory scheme for cable is the impact upon territorial cable television." *NYSCCT's Comments in Opposition* at 40, J.A. 438. Since the dominant theme of the petitioner's opposition to the preemption order is the alleged need to stifle SMATV development, the Commission rationally determined that federal preemption was necessary to effectuate its policy of enhancing the diversity of cable programming.[11] *See National Association of Reg-*

---

**10.** We evaluate the Commission's action under the arbitrary and capricious standard of 5 U.S.C. § 706(2)(A) even though the Commission has, in fact, chosen not to promulgate rules to replace the vacuum created by federal preemption. The argument could be raised that since the Commission has chosen not to promulgate rules, the highly deferential standard of *WWHT, Inc. v. FCC*, 656 F.2d 807 (D.C.Cir.1981), should be applied. Judicial review of an agency decision not to promulgate a rule is extremely limited because such a decision " 'is inevitably based, in large measure, on factors not inherently susceptible to judicial resolution'" such as internal management considerations or evaluation of the agency's own competence. *Id.* at 807 (quoting *Natural Resources Defense Council v. SEC*, 606 F.2d 1031, 1046 (D.C.Cir.1979)). Unlike the decision not to promulgate a rule, federal preemption—whether resulting in the imposition of elaborate federal regulations or the creation of a regulatory vacuum—is an affirmative exercise of agency power; it involves the compilation of a record and the articulation of the agency's determination that the state regulatory scheme conflicts with federal objectives. Such a decisionmaking process is susceptible to judicial review under the normal application of the arbitrary and capricious standard.

**11.** In a closely related argument, petitioner NYSCCT claims that there is inadequate evidence in the record to show that competition from SMATV will increase the viewing choices

*ulatory Commissioners v. FCC*, 525 F.2d 630, 646 (D.C.Cir.) (preemption of anticipated state regulation of mobile radio systems "necessary in order to create the atmosphere of free entry and competition"), *cert. denied*, 425 U.S. 992, 96 S.Ct. 2203, 48 L.Ed.2d 816 (1976).

Petitioners contend with only slightly more force that the Commission acted arbitrarily by failing to consider the impact preemption and deregulation would have upon the traditional cable industry. Petitioner NYSCCT estimated that the unregulated entry of SMATV into the New York City marketplace would cost franchise cable systems between $348 million and $793 million over the lifetime of the franchises.[12] To replace the revenue lost from those subscribers who would choose SMATV, the franchise systems would have to increase their rates of their remaining subscribers from $7.00 to $11.00 per month.

The Commission found NYSCCT's analysis unpersuasive for several reasons. First, the Commission stated that it is "not an economic guarantor of competing communications technologies which may offer similar services to subscribers." 55 Rad. Reg.2d (P & F) at 1433. Second, the Commission noted that NYSCCT's arguments had been raised and answered in the *Orth-O-Vision* proceedings. Finally, the Commission predicted that, in states such as New York where cable franchises have mandatory access to multi-unit dwellings, franchise cable and SMATV could co-exist or at least compete for the same subscribers. *Id.*

The Commission's response, while terse, was reasonably commensurate with the persuasive force of the petitioner's argument. Petitioner's "economic analysis" purports to document the degree of SMATV penetration into the cable television marketplace. Instead of doing so, it simply assumes that SMATV will replace franchise cable in every apartment of every multi-unit dwelling. Moreover, the data provided by the petitioner, viewed in the most positive light, merely show what the Commission already recognizes: the unregulated entry of SMATV into the cable television marketplace will have a competitive impact upon franchise cable. Petitioner's argument does not relate to the Commission's evaluation of the *facts;* it merely involves a recharacterization of the petitioner's basic quarrel with the Commission's *policy* of allowing SMATV to compete with franchise cable. We have already determined that the Commission has the statutory authority to adopt the policy of preventing local governments from enforcing entry regulations that have the purpose or the effect of restricting SMATV's competitive position. Evidence purporting to document the degree of SMATV penetration into the cable television marketplace does nothing to undermine the rationality of this decision. *See Computer and Communications Industry Ass'n v. FCC*, 693 F.2d 198, 217 (D.C. Cir.1982) (refusing to engage in a debate about the wisdom of relying on market forces, given that that choice of policy was within the statutory mandate and not arbitrary or capricious), *cert. denied*, 461 U.S.

available to cable subscribers. This contention seems to be based on the assumption that subscribers in large apartments will be forced to subscribe to SMATV and that SMATV service is inferior to the service offered by franchise cable. Again, however, the petitioner itself provides adequate evidence to refute each of its own contentions. First, as the brief for the petitioner notes, New York law requires that traditional cable be made available to every multi-unit dwelling regardless of the owner's consent. It appears, therefore, that residents of multi-unit dwellings will have a choice between SMATV and traditional franchise cable. Second, the petitioners recognize that SMATV is capable of providing the same service as tradi-

tional cable, Brief for New York City at 4; Brief for NYSCCT at 3, at a drastically lower price. *See* NYSCCT's Comments in Opposition at 31, J.A. 429 (estimating that SMATV can be installed at one-fourth the cost of traditional cable).

**12.** The higher figure is based on the assumption that SMATV operators will completely replace franchise systems in every building or housing complex of 100 or more tenants; the lower figure is based on the assumption that SMATV will replace franchise cable in every complex of over 200 tenants. Brief for NYSCCT at 21. These amounts are equal to 32% to 73% of the projected cost of building the cable systems. *Id.*

938, 103 S.Ct. 2109, 77 L.Ed.2d 313 (1983).[13]

### D. *Procedural Objections*

Petitioners claim that the Commission abused its discretion by failing to engage in a rulemaking procedure pursuant to 5 U.S.C. § 553 (1982). The Commission labeled its action a "declaratory ruling and consolidation of precedent," technically an adjudication under section 5(e) of the Administrative Procedure Act, 5 U.S.C. § 554(e), which provides that an administrative agency "in its sound discretion, may issue a declaratory order to terminate a controversy or remove uncertainty."

■ The decision whether to proceed by rulemaking or adjudication lies within the Commission's discretion. *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294, 94 S.Ct. 1757, 1771, 40 L.Ed.2d 134 (1974); *SEC v. Chenery Corp.*, 332 U.S. 194, 203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1974). This is true "regardless of whether the decision may affect agency policy and have general prospective application." *Chisholm v. FCC*, 538 F.2d 349, 365 (D.C.Cir.), *cert. denied*, 429 U.S. 890, 97 S.Ct. 247, 50 L.Ed.2d 173 (1976).

■ We find no abuse of discretion in the Commission's choice of procedures. In a factually identical situation, the court in *New York State Commission on Cable Television v. FCC*, 669 F.2d 58, 62 n. 9 (2d Cir.1982), held that the Commission's decision to issue a declaratory ruling to preempt state and local regulation of MDS, following notice and opportunity for comment, did not amount to an abuse of discretion. Similarly, in *North Carolina Utilities Commission v. FCC*, 537 F.2d 787 (4th Cir.), *cert. denied*, 429 U.S. 1027, 97 S.Ct. 651, 50 L.Ed.2d 631 (1976), manufacturers and distributors of communications equipment petitioned the Commission to rule that state regulatory agencies were precluded from restricting or regulating the interconnection of customer-provided equip-

ment to telephone facilities. The Commission "[a]fter adequate notice and consideration of written and oral submissions by some 46 interested parties," issued a declaratory judgment saying that it had primary authority over interconnection, thereby precluding any state intervention. 537 F.2d at 791. The court affirmed, holding that "we have no doubt that matters presented in this proceeding were ripe for consideration and appropriate for disposition by declaratory ruling." *Id.* at 791 n. 2.

Furthermore, to remand solely because the Commission labeled the action a declaratory ruling would be to engage in an empty formality: the Commission gave adequate notice and received comments from over 25 interested parties. The arguments raised in the proceedings below, identical to the issues on appeal, provided the Commission with both sufficient quantity and diversity of information upon which to decide the questions presented. *See Chisholm*, 538 F.2d at 365.

For the foregoing reasons, the Commission's order is

*Affirmed.*

---

13. Since we have found that the Commission's action does not represent a reversal of policy, we need not address petitioner NYSCCT's contention that we must find in the Commission's decision " 'analysis indicating that prior policies

... are being deliberately changed not casually ignored.' " Brief for NYSCCT at 13 (quoting *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C.Cir.1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971)).